**Arthur HODAS and Wife, Cynthia Hodas, Appellants,**

v.

**SCENIC OAKS PROPERTY ASSOCIATION,**
**Appellee.**

No. 04–98–00287–CV.

Court of Appeals of Texas,
San Antonio.

April 26, 2000.

Rehearing Overruled May 30, 2000.

Lopez, J., filed concurring and dissenting opinion.

John C. Dulske, Thurman & Phillips, P.C., San Antonio, for appellants.

Philip E. Hamner, San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by: PAUL W. GREEN, Justice.

Art and Cynthia Hodas (collectively "the Hodases") appeal from the trial court's grant of summary judgment in favor of the appellee, Scenic Oaks Property Association ("the Association") on the Association's claim for unpaid property assessments. The trial court held all assessments levied against the Hodases were valid and the Association conclusively proved each and every element of its claim. Judgment in the amount of $35,269.42, including attorney's fees, plus interest at ten percent per annum, was entered against the Hodases. In one issue on appeal, the Hodases assert the Association failed to prove its claim because the assessments levied against them were invalid as a matter of law. We affirm the trial court's judgment.

### Statement of Facts

The original deed restrictions and covenants for the Scenic Oaks subdivision were established by the developer, RET Enterprises, Inc., on June 4, 1979. All restrictions were duly recorded with the county clerk's office in Bexar County, Texas.

These restrictions were later amended on May 11, 1981, and the amended restrictions were filed with the county clerk. By virtue of their property ownership in Scenic Oaks, Art and Cynthia Hodas are subject to all restrictions and covenants of the subdivision, as provided in their warranty deed dated March 14, 1983. In fact, all property owners in Scenic Oaks subdivision are governed by the restrictive covenants referenced in their warranty deeds.

The record shows Art Hodas served as a member and treasurer of the Association board of directors from October 1984 to May 1988. On April 10, 1987, a special meeting was held to discuss assessments for a twenty-four hour security guard and a new secured entrance gate. Notice of the meeting was provided through a proxy voting form dispensed to subdivision property owners, which stated in part, "Notice is given that a meeting of members of the Scenic Oaks Property Owners' Association is scheduled for April 10, 1987 at a time and place to be announced, for the purpose of considering special assessments."[1] According to their proxy form, the Hodases voted to waive the holding of an actual meeting, and voted for a security gate and twenty-four hour security guard to be assessed as a one-time fifty dollar fee and a monthly fee of twenty-five dollars a month.

■ Minutes of the meeting indicate Art Hodas was present and gave a summary of the proxy votes and survey results. In that meeting, the "special assessment," as it was termed in the meeting minutes, was approved and a twenty-five dollar monthly charge for a twenty-four hour security guard and a one-time one hundred dollar assessment for a secured entrance gate[2] was levied. According to the summary judgment evidence, the Hodases made payments on the security assessments through May of 1989. The security assessment for the guard continues to be an ongoing assessment levied against the appellants.

In May of 1988, Art Hodas resigned as a member of the Association board of directors. On August 6, 1990, another special membership meeting was held in which a proposed road and drainage assessment was approved. The members voted to approve a one-time assessment that would finance a multi-year capital improvement project. A payment plan was adopted, consisting of a one-time fifty dollar payment and then a ten dollar monthly payment beginning on October 1, 1990, and continuing through February 28, 1996. Neither Hodas nor his wife participated in the passage and approval of the road and drainage assessment. However, this assessment was levied on the Hodases from October 1, 1990, through February 1, 1996. The last payment made to the Association by the Hodases was in May of 1989 for two hundred dollars.

## Scope and Standard of Review

On review, we consider whether the summary judgment proof established as a matter of law that there is no genuine issue of material fact as to one or more of the essential elements of plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). On appeal, the movant has the burden to show that no genuine issue of material fact existed and that he is entitled to judgment as a matter of law. *American Tobacco Co. v.*

1. This single page notice and proxy voting form specifically informed the property owners that the Association was seeking direction with regard to security measures in the subdivision. The voting form allowed the owners to choose between six different security options or to vote for no security at all, to waive a meeting of homeowners or to request a meeting of homeowners for further discussion.

2. The Hodases do not appear to complain about the security gate assessment. They contend that this one-time hundred dollar fee is a special assessment but they do not claim that it violated the provisions of Section H. To the extent there may be some question, we hold the security gate assessment was a special assessment, that it was adopted in accordance with Section H, and was valid.

*Grinnell,* 951 S.W.2d 420, 425 (Tex.1997) (citing *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex. 1985)). We indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Id.* Where a disputed fact issue does exist, evidence favoring the non-movant will be taken as true. *Id.* The scope of our review is based on the grounds asserted by the movant in its motion for summary judgment. *See* Tex. R. Civ. P. 166a(c).

## Discussion and Analysis

### *The Dispute*

It is undisputed that property assessments for the Scenic Oaks subdivision are regulated by the terms of the original Restrictive Covenants incorporated into the property deeds by the developer, and the Amendments to Restrictions for Scenic Oaks Subdivision Unit II filed in the county records in 1981. The Hodases say both the monthly security guard assessment and the road and drainage assessment were special assessments governed by Section H of the restricted covenants. Section H governs special assessments and reads as follows:

> *Section H. Special Assessments for Capital Improvements.* In addition to the annual assessment authorized above, the Association may levy, in any assessment year, a special assessment applicable to that year only for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair or replacement of a capital improvement upon the Common Area, including fixtures and personal property related thereto, *provided that* any such assessment shall have the assent of two-thirds (2/3rds) of the votes of each class of members who are voting in person or by proxy at a meeting duly called for this purpose.

The Hodases claim the security guard assessment is invalid because it was not intended to be, and was not, used for a capital improvement, the only type of project authorized by Section H. The Hodases contend the road and drainage assessment is invalid because it was to be paid over a period exceeding one year and special assessments for capital improvements under Section H must be collected in the year in which they are assessed. If the security guard assessment and road and drainage assessment are invalid under the deed restrictions, the Association's deficiency judgment cannot be affirmed. In the alternative, the Hodases argue a question of fact exists whether or not these assessments were in fact special assessments to be governed by Section H.

The Association counters that the security guard assessment was an annual assessment subject to the restrictions of Section G, not a special assessment which triggered the application of Section H. Section G outlines the maximum annual assessments which can be assessed by the board of directors and states:

> Until January 1 of the year immediately following the conveyance of the first Lot to an Owner, the maximum annual assessment shall be Sixty and No/100 Dollars ($60.00) per Lot.

> (i) From and after January 1 of the year immediately following the conveyance of the first Lot to an Owner, the maximum annual assessment may be increased each year not more than ten percent (10%) above the maximum assessment for the previous year without a vote of the membership.

> (ii) From and after January 1 of the year immediately following the conveyance of the first Lot to an Owner, the maximum annual assessment may be increased above ten percent (10%) by a vote of two-thirds (2/3rds) of each class of members who are voting in person or by proxy, at a meeting duly called for this purpose.

> (iii) The Board of Directors may fix the annual assessment at an amount not in excess of the maximum.

The Association further maintains that the road and drainage assessment meets all the requirements of Section H. According to the Association, Section H merely mandates that total liability be *imposed* in the year in which a special assessment's total amount is determined. The Association contends that section H does not require complete collection of a special assessment in the year it is imposed.

### Interpretation of Restrictive Covenants

■■■ "Restrictive covenants are subject to the general rules of contract construction." *Pilarcik v. Emmons,* 966 S.W.2d 474, 478 (Tex.1998). The question of whether a restrictive covenant is ambiguous is a question of law for the court. *Pilarcik,* 966 S.W.2d at 478; *Fisk Elec. v. Constructors & Associates,* 888 S.W.2d 813, 814 (Tex.1994). On review, this court must attempt to determine the objective intent of the covenant and whether that intent was violated. *Munson v. Milton,* 948 S.W.2d 813, 816 (Tex.App.-San Antonio 1997, writ denied); *see also Wilmoth v. Wilcox,* 734 S.W.2d 656, 658 (Tex.1987) (construing meaning of restrictive covenant entails determination of intent of framers). We liberally construe the covenant to give effect to its purpose and intent. Tex. Prop.Code Ann. § 202.003(a) (Vernon 1995); *Pilarcik,* 966 S.W.2d at 478 (stating the entire document must be given effect or provisions are rendered meaningless); *Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997) (holding contracts should be examined as a whole in light of circumstances present when parties entered into agreement).

■■■ Mere disagreement over the interpretation of a provision does not make it ambiguous. *See Miller v. Sandvick,* 921 S.W.2d 517, 522 (Tex.App.-Amarillo 1996, writ denied) (*citing Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981)). If a phrase or covenant is so worded that we can give it a certain legal meaning, it is not ambiguous, and we will construe it as a matter of law, giving effect to the objective intent of the drafter as expressed or as is apparent in the provision. *Miller,* 921 S.W.2d at 522; *see also City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968); *Highlands Management, Inc. v. First Interstate Bank of Texas, N.A.,* 956 S.W.2d 749, 756 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). If a covenant is susceptible to more than one *reasonable* construction, it is ambiguous. *See Pilarcik,* 966 S.W.2d at 478. If ambiguity exists, the covenant will be construed against the party seeking to enforce it. *Wilmoth,* 734 S.W.2d at 657.

### Security Guard Assessment

The Hodases contend the assessment for a twenty-four hour security guard is a special assessment which falls under the requirements of Section H of the amended restrictions because the meeting notification and proxy voting form sent out by the Association stated that the April 10th meeting would be held to consider "special assessments." The Hodases assert that some weight should be afforded to the Association's treatment of the security assessment as a "special assessment" in its notification to property owners.

■■■ We refuse to hold that the security assessment is a "special assessment" based solely on the fact that the Association termed it a "special assessment" in the meeting notification and minutes. Instead, we turn to the wording of the property restriction itself. It is the restriction which embodies the intent of a covenant, not the notification to the property owners. *See Wilmoth,* 734 S.W.2d at 657–58.

Section E of the Restrictive Covenants binds each property owner to pay, as a personal obligation, "(1) annual assessments or charges, and (2) special assessments for capital improvements ..." Section F provides that all assessments shall be used exclusively for "the recreation, health, safety, and welfare of the residents in the Properties and for the improvement

and maintenance of the Common Area." [3] Section F also requires the Association to make certain assessments as follows:

> The Scenic Oaks Property Owners Association *shall make* assessments and collect fees from the members for maintenance costs of the private roads, private road right-of-way, and Common Areas, if any, *as well as cost of security services and facilities, specifically including the controlled access entrance* to the Subdivision.

(Emphasis added). It is clear from the wording of this section that the Association has a duty to make and collect assessments for maintenance of the subdivision property and the cost of security services. The security guard assessment falls within the scope of the Association's authority to make and collect assessments for the purpose of "security services and . . . the controlled access entrance."

Special assessments for capital improvements are authorized under the provisions of Section H, which reads in pertinent part as follows:

> . . . the Association may levy, in any assessment year, a special assessment applicable to that year only for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair or replacement of a capital improvement upon the Common Area . . .

We agree with the Hodases that the security guard assessment is not an assessment for capital improvement authorized by Section H; however, the fact that the general term "special" was used to describe the proposed monthly assessment in the property owners' notice does not foreclose our inquiry.

▮ We hold the security guard assessment falls within the Association's authority as provided by Section G of the amended restrictions. Section G provides

for an initial annual maximum assessment at sixty dollars per lot. After the first year, the Association board may authorize an increase in the annual maximum assessment of up to ten percent. An increase over ten percent in the maximum annual assessment must be approved by two-thirds of the Association members voting at a special meeting called for that purpose. There is no limitation on the use of this annual assessment except as set out in Section F.

According to the minutes of the April 10th meeting, sixty percent of the eligible voters were present to constitute a quorum to hold the meeting specially called to approve the security guard assessment. Two-thirds of those voting, in person or by proxy, cast their votes to approve the assessments; thus, the assessments passed by the requisite two-thirds vote. We conclude, therefore, that the Association had the authority to assess a fee for a security guard and that fee was properly approved according to the terms of Section G.

The Hodases also contend that if the security guard assessment was an annual assessment, the accounting to property owners did not mirror an annual accounting. Rather, it was in the nature of a monthly twenty-five dollar charge. The Association, in response, argues that a monthly charge of an annual assessment is permitted by the restrictions. We agree. Under Section J of the restrictions, annual and special assessments must be fixed at a uniform rate on all lots. Collection of these assessments can be done on a monthly or annual basis. In the present case, the annual assessment for the guard was levied in 1987 and thereafter charged on a uniform monthly basis. This charge is evident in the Hodases' billing account which indicated a monthly twenty-five dollar charge. The monthly charge was appropriate given the provisions of Section J.

---

**3.** The "Common Area" is defined as all real property owned by the Association for the common use of the owners.

██ The Hodases also argue, in the alternative, that the security guard assessment failed to follow the provisions regarding notification of annual assessments outlined in Section K. Although this argument was not raised in the Hodases' response to the Association's motion for summary judgment, we are not precluded from addressing this ground on appeal. *See City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979) (stating "[t]he non-movant need not answer or respond to the motion to contend on appeal that the grounds presented to the trial court by movant are insufficient as a matter of law"). Thus this legal challenge did not have to be raised by the Hodases at the trial court level for us to consider it on appeal. *Id.; see Carabajal v. UTV,* 961 S.W.2d 628, 631 (Tex.App.-San Antonio 1998, pet. denied).

Section K states, in part:

The Board of Directors shall fix the amount of each annual assessment against each Lot at least thirty (30) days in advance of each annual assessment period. Written notice of the annual assessment *shall be* sent to every Owner subject thereto. The due dates shall be established by the Board of Directors.

(Emphasis added).

The Hodases do not contend the Association failed to give notice of the assessments, but argue that Section K mandates the Association to provide a mathematical breakdown of annual assessments. We do not agree. The clear intent of the provision is that written notification must be sent by the Association. Section K does not specify the form of the written notification. Additionally, there is summary judgment evidence of the Hodases' billing statements which set out, by category and date, the charges for annual dues and the monthly security assessment, the one-time entrance gate assessment, and charges for the 1990 road and drainage assessment. These uncontroverted documents are some evidence that proper written notification was received by the Hodases in accordance with Section K.

### Road and Drainage Assessments

The Hodases contend, and the Association does not disagree, that the road and drainage assessment was a special assessment subject to the terms of Section H. The Hodases complain that the road and drainage assessment was invalid because it was to be paid over a period of more than a year.

██ Section H provides that the Association "may levy, in any assessment year, a special assessment *applicable to that year only* ..." (emphasis added). The use of a special assessment is specifically limited to costs for capital expenditures. We note that the words used in a restriction may not be "enlarged, extended, stretched or changed by construction" but "will be given their commonly accepted meaning." *Wilmoth,* 734 S.W.2d at 657. When we consider the plain language of Section H and construe it as one provision in a set of related restrictions, the meaning is clear and unambiguous. *See Pilarcik,* 966 S.W.2d at 478–79 (construing language at issue in light of the restrictions as a whole).

The plain meaning of the phrase "applicable to that year only" is that any special assessment is *effective* only for the year in which it is assessed. When contrasted with the annual assessment allowed by Section G, the distinction is significant. Once the maximum annual assessment under Section G has been raised, either by the board or by a vote of members, the new annual amount can be imposed in following years by the board without further approval by the property owners. A Section H special assessment is only effective one time. It cannot be imposed again without the vote of the membership in accordance with the instructions of Section H.

Our interpretation is consistent with other language used in Section H. The

term "levy" means "to impose or collect." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981).Thus the Association has discretion to impose or collect the special assessment in the year it is assessed. There is nothing in the language of Section H that requires the Association to both impose *and* collect a special assessment in one year.

The scheme set out in Section H accomplishes two practical purposes. It allows the property owners to undertake large and/or multi-year capital improvement projects that might otherwise be financially impossible if the entire amount of the project had to be funded in a single year. It also ensures that each project is individually approved by the property owners, not simply left to the discretion of the board. The Hodases suggest that Section H was intended to require the board to return to the property owners for approval of a special assessment each year, even for a single large project that cannot be completed in one year. We find this unreasonable. As a practical matter, the Hodases' interpretation would make it impossible for the Association to contract for certain capital improvement projects that might be necessary for the health or safety of the subdivision, even if one hundred percent of the property owners approved, thwarting the very purpose of Section H.

██ In this case, the road and drainage assessment was a one-time special assessment of a specific amount to be used for a specific project. The road and drainage assessment was imposed upon the property owners in 1990 and cannot be assessed again without the approval of the property owners. The property owners were given the option to pay the entire amount at once or to follow the payment plan adopted by the Association. The record shows several property owners opted to pay the entire amount up front. We hold that the road and drainage assessment was adopted in accordance with Section H and was valid.

### Conclusion

Because we conclude the assessments about which the Hodases complain are valid, we affirm the trial court's judgment.

Concurring & dissenting opinion by: ALMA L. LÓPEZ, Justice.

LÓPEZ, Justice, concurring and dissenting.

Although I concur with the majority's analysis of the monthly security guard assessments, I disagree with the majority's analysis of road and drainage assessments. Section H of the restrictive covenants provides that the Association "may levy, in any assessment year, a special assessment *applicable to that year only* . . . ." (Emphasis added). The plain meaning of the phrase "applicable to that year only" is that any special assessment levied is effective for the year in which it is assessed. The provision simply does not provide that the special assessment may be extended beyond the year assessed. Although the majority reasons that it is unreasonable to require the board to return to the property owners each year for approval of this special assessment, the practicality of rules contained within the restrictive covenants and amendments is not for this court to decide. There is no evidence in the Association's motion for summary judgment to suggest that the Association obtained the requisite voter approval to levy special assessments for road and drainage for 1991 through 1996. As a result, this court cannot determine as a matter of law that the road and drainage assessments were valid for those years. I would reverse the trial court's judgment and remand the cause to the trial court for the re-computation of damages. In addition, because the trial court's judgment includes attorney's fees, I would also remand for recalculation of attorney's fees.